UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| Plaintiff, ) | No. 13-CR-66-DCR-REW-2 |
| ) | |
| v. ) | |
| ) | RECOMMENDED DISPOSITION |
| ALIYA RAE ADAMS, ) | |
| ) | |
| Defendant. ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendant Aliya Rae Adams, by counsel, moves to suppress evidence obtained from her residence pursuant to a state search warrant.[1]  DE #49 (Motion).  Specifically, Adams contends that the search warrant affidavit lacked sufficient information to support a probable cause finding.  DE #49-1 at 3 (Memorandum in Support of Motion to Suppress).  Adams further contends that incriminating statements she made to law enforcement following the search must be suppressed as fruit of the poisonous tree.  *Id.* at 6. Adams argues that the good faith exception to the exclusionary rule articulated by the Supreme Court in *United States v. Leon*, 104 S. Ct. 3405 (1984), does not apply.  DE #49-1 at 7.

---

[1] The motion has been submitted to the undersigned for a recommendation pursuant to the District Judge's Standing Referral Order for criminal actions.  DE #10 (Standing Referral Order).

1

The United States filed a response in opposition to the motion. DE #58 (Response). Defendant replied. DE #63 (Reply). Because the motion calls for "four corners" review of the warrant documents, the Court did not hold an evidentiary hearing.[2]

Having reviewed the briefs submitted by counsel, as well as the subject warrant and affidavit, the Court recommends that the District Court **DENY** the motion to suppress. A substantial basis supported warrant issuance, and, in any event, the exclusionary rule does not apply under current standards.

I.   **Background**

On March 14, 2013, Detective Jared Curtsinger with the Lexington Division of Police executed a search warrant for the person and residence of Robert Earl Jones, one of Adams's co-defendants in the instant matter. Detective Curtsinger had been investigating Jones for trafficking heroin. In executing the search warrant, Curtsinger recovered heroin from Jones's person. Jones immediately began cooperating with law enforcement, stating that he had purchased the heroin from Defendant at her residence in the Preakness Apartments on Versailles Road. Based on Jones's statements, as well as other corroborating information, Detective Curtsinger submitted an affidavit to search Defendant's residence and person. Curtsinger made the application and got the warrant on the same day he searched Jones. The affidavit contained the following averments by affiant Curtsinger:

> On 03-14-2013 the affiant set out to execute a search warrant at 2408 Elderberry Court, Apartment 3. The search warrant was also for a suspected heroin dealer identified as Robert Jones. Prior to executing the search warrant the affiant was able to observe that Robert Jones [sic] vehicle was parked in the parking lot of 1724 Versailles Road which the

---

[2] Additionally, the parties agreed that a hearing was not necessary. *See* DE ##53, 54. Assessment for probable cause encompasses only the warrant application materials. *See United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006).

affiant knows to be the Preakness Apartment Complex. The affiant observed that the vehicle only remained at Preakness Apartments for approximately five minutes. The affiant then observed that Jones left that location and drove directly to his residence at 2408 Elderberry Court. The affiant and other Detectives were waiting for Jones to arrive and when he did he was detained and the search warrant was executed. Jones was found to have an ounce of heroin in his jacket pocket. Jones advised that he wanted to cooperate with the investigation and advised that he had just purchased the heroin at the Preakness Apartments for $3000.00. Jones advised that he was had [sic] been buying large quantities of heroin from a group in Lexington for several months. Jones advised that when he made contact with his source on this date to purchase an ounce of heroin, the source advised him to go to the girl that Jones knows as "Aliya's" apartment to purchase the heroin. Jones advised that he had been to the apartment on a previous date and knew which apartment he was referring to.

      Jones advised that he went to the apartment which is at the Preakness Apartments just prior to us arresting him and went inside the apartment on the left at the top of the stairs. He advised that he provided the "Aliya" subject with the $3000.00 cash and that she provided him with the one ounce of heroin. He advised that "Aliya" is a biracial female in her thirties. He advised that there were children present in the apartment during the transaction. He advised that the "Aliya" subject drives a silver Monte Carlo passenger car that was parked in the parking lot when he was there.

      The affiant escorted Jones to the Preakness Apartments in an undercover police car. Jones directed the affiant to the back of the apartment complex and pointed out Building B as the building that the suspects [sic] apartment was located. The affiant went inside the common entry door with Jones and Jones pointed out Apartment B215 as the apartment that he had purchased the heroin from earlier this date which he had on his person when he was confronted by the affiant. Jones also pointed out a silver Monte Carlo passenger car that was parked in front of the building. He advised the affiant that the car was the car that belonged to the "Aliya" subject. The vehicle had a vehicle registration plate of 182FWS. The vehicle was registered to Aliya Adams at 1724 Versailles Road Apartment B215. The affiant was also able to locate a photograph of Aliya Adams and showed it to Jones. Jones advised that the female in the photograph was the subject he knew as "Aliya" and the female subject that sold him the ounce of heroin at her apartment within the last two hours. The affiant also located in police computers where Adams list [sic] her address on her Kentucky Drivers License as 1724 Versailles Road, Apartment B215, Lexington, KY. The affiant also located where Adams was convicted of Possession of Marijuana in 2003, 2004, 2007, and 2010.

      Based on the information received during the investigation and the follow-up investigation conducted by the affiant the affiant believes that

3

>evidence of narcotics use, possession, or trafficking will be found upon immediate search of the property located at 1724 Versailles Road, Apartment B215, Lexington, Kentucky.

DE #49-3; DE #58-2.

After reviewing Detective Curtsinger's affidavit, Fayette District Court Judge Joe Bouvier issued the requested search warrant for Adams's person and premises. DE #49-3; DE #58-2. Law enforcement executed the search warrant late in the afternoon on March 14. DE #49-3; DE #58-2. In Defendant's residence, per the briefing, law enforcement found and seized numerous items of drug paraphernalia, heroin, cutting agents, and other items. DE #49-1 at 2. Additionally, Defendant made incriminating statements to Detective Curtsinger, who subsequently arrested her. *Id.*

On May 3, 2013, a federal grand jury in this District indicted Adams, Jones, and Eric Dawayne Jackson on heroin trafficking charges. DE #1 (Indictment). Counts 1, 2, 3, and the forfeiture count of the Indictment apply to Adams. *Id.* Count 1 charges Adams with conspiracy to distribute 100 grams or more of a mixture of substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846. DE #1. The alleged conspiracy occurred in Fayette County from November 2012 to March 2013. *Id.* Counts 2 and 3 charge Adams with possession with intent to distribute heroin and distribution of heroin, respectively. *Id.* The conduct in Counts 2 and 3 allegedly occurred on March 14, 2013. *Id.* After Adams was taken into federal custody and arraigned, she timely filed the motion to suppress pending before the Court.

**II.     Analysis**

    **A.     The Search and Warrant Validity**

The Fourth Amendment mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation."[3] U.S. CONST., amend. IV. Probable cause consists of "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *See United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). To determine probable cause, an issuing magistrate must examine the totality of the circumstances and find "a 'fair probability' that evidence of a crime will be located on the premises of the proposed search." *See United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir. 2005) (quoting *United States v. Bowling*, 900 F.2d 926, 930 (6th Cir. 1990)). A supporting affidavit must sufficiently demonstrate the existence of a "nexus between the place to be searched and the evidence sought" *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (quoting *United States v. Van Shutters*, 163 F.3d 331, 336-37 (6th Cir. 1998)).

When evaluating whether a warrant application presented probable cause, a reviewing court must accord "great deference" to the issuing judicial officer's determination. *See United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006). Such deference ensures than "an issuing [judge's] discretion [will] only be reversed if it was arbitrarily exercised." *See United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000). The

---

[3] Adams's brief includes a reference to the Kentucky Constitution. Neither side develops any independent state theory, and Kentucky treats the relevant state provision as coterminous with the Fourth Amendment. *See Dunn v. Commonwealth*, 360 S.W.3d 751, 758 (Ky. 2012) (noting that the Kentucky Supreme "Court has consistently held that the protections of Section 10 of the Kentucky Constitution are no greater than those of the federal Fourth Amendment"); *Sigler v. Commonwealth*, 2010 WL 5018160, at *2 (Ky. App. Dec. 10, 2010) ("Kentucky courts interpret Section Ten of the Kentucky Constitution as consonant with the Fourth Amendment and, thus, it provides the same scope of protections as its federal counterpart.").

reviewing court must uphold the issuing judge's probable cause determination if a "substantial basis" existed for the judge to conclude "that a search would uncover evidence of wrongdoing." *See Illinois v. Gates*, 103 S. Ct. 2317, 2331 (1983); *Allen*, 211 F.3d at 973.

Additionally, line-by-line scrutiny of the supporting affidavit is inappropriate, *see United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006) (citing *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004)), and the reviewing court must limit its analysis to the "information presented in the four corners of the affidavit." [4] *Id.* at 306; *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005). When the search at issue occurred pursuant to a warrant, the defendant has the burden of establishing a prima facie case that the search was illegal. *United States v. Murrie*, 534 F.2d 695, 697-98 (6th Cir. 1976); *see also United States v. Franklin*, 284 F. App'x 266, 275 (6th Cir. 2008) (Clay, J., dissenting).

In support of her motion to suppress, Adams relies heavily on the Sixth Circuit's decision in *United States v. Higgins*, 557 F.3d 381 (6th Cir. 2009). *Higgins* involved a warrant to search a defendant's residence based on information obtained during a traffic stop. *Id.* at 385. The affidavit at issue, set out here because of Adams's parallel arguments, read as follows:

> On September 9, 2005, Sgt. Carneal received information from the Henderson Police Department (Chester County) regarding a traffic stop conducted in that jurisdiction in which Officer Phil Willis of the

---

[4] The Government's responsive pleading references the underlying search warrants and supporting affidavits for Jones's person, residence, and vehicle, and the Government attached the Jones warrant documents to its brief. *See* DE #58; DE #58-1. Because the Court is reviewing the sufficiency of the evidence supporting probable cause to search **Adams** and her residence, however, the Court does not consider the Jones warrant documents, or the Government's arguments regarding same in the probable cause calculus. *See Frazier*, 423 F.3d at 531; *see also infra* note 7 regarding *Leon*.

6

>Henderson Police Department recovered a large amount of cocaine and cocaine base. Officer Willis stated that he stopped a suspect for driving under the influence. Officer Willis informed Sgt. Carneal that the suspect had approximately 15 grams of powder cocaine, along with 26 grams of cocaine base. (Both substances field tested positive for cocaine). The suspect also had two additional passengers in the vehicle. All three individuals were separated and interviewed separately at the Chester County Sheriff's Department. The driver of the vehicle, whose name has been disclosed to the Judge, stated he picked up the cocaine from a location in Madison County and gave an address of 1336 Campbell Street, Apartment 5, Jackson, Tennessee, as the pick up location for the narcotics. He also identified the person selling the narcotics as Oliver Higgins. This information was corroborated by both passengers of the vehicle who stated they rode with the driver to the Campbell Street location. Officers from Metro Narcotics did transport the driver of the vehicle to the Campbell Street address to confirm the exact location of the transaction. Officers with the Metro Narcotics Unit corroborated the address given by the driver of the vehicle, along with the description of a motorcycle which belonged to Oliver Higgins. Officers with Metro Narcotics did identify the motorcycle as belonging to Oliver Higgins and which was located at 1336 Campbell Street, Apartment 5, Jackson, Tennessee. The driver stated he had purchased narcotics from this location previously and had purchased the cocaine in his vehicle on September 9, 2005 from Oliver Higgins. A check of the criminal history of Oliver Higgins showed two prior felony convictions for narcotics trafficking in Hardin County, Tennessee, in 1990 and 1998.

*Id.*

The Sixth Circuit (in a 2-1 decision) found that, under the totality of the circumstances, the affidavit did not establish probable cause to search Higgins's apartment. *Id.* at 390. In doing so, the Court first voiced concerns about the sufficiency of the information provided regarding the informant's reliability. *Id.* at 389-90; *see id.* at 389 ("When a search warrant issues based on an informant's tip, that informant's '"veracity," "reliability," and "basis of knowledge" are all highly relevant,' but are not 'separate and independent requirements to be rigidly exacted in every case.'") (quoting *Gates*, 103 S. Ct. at 2328). The Court noted that the "affidavit did not attest to the informant's reliability." *Id.* at 389. The Court recognized the Supreme Court's holding

7

that "'[a]dmissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search.'" *Id.* (quoting *United States v. Harris*, 91 S. Ct. 2075, 2082 (1971)). But, the Court explained that the Sixth Circuit, in considering *Harris*, has held that an admission against penal interest, while significant, is not always a conclusive reason for crediting the statements of an informant. *Id.* (citing *Armour v. Salisbury*, 492 F.2d 1032, 1035 (6th Cir. 1974)). According to the *Higgins* Court, "the fact that the informant was known to the affiant and issuing magistrate and admitted a crime does not alone provide probable cause." *Id.* at 390.

The Court went on to find that the affidavit provided insufficient corroborating information "to reinforce the informant's assertions." *Id.* The Court noted that "[t]he affidavit states that the other passengers in the car confirmed the informant's statement, but it does not say whether they did so unprompted or if the police asked them whether the drugs had come from Higgins's apartment." *Id.* The Court further noted that "[t]he affidavit states that the police corroborated the fact that Higgins lived at the stated location, owned the motorcycle parked outside, and had a drug-related criminal history, but none of these facts supports the informant's assertion that he had purchased drugs from Higgins at this location the previous day." *Id.*

The Court also found that the Higgins search warrant affidavit failed to "establish the necessary 'nexus between the place to be searched and the evidence sought.'" *Id.* (quoting *Van Shutters*, 163 F.3d at 336-37). The Court explained that the "affidavit does not assert that the informant had been inside Higgins's apartment, that he had ever seen

drugs or other evidence inside Higgins's apartment, or that he had seen any evidence of a crime other than the one that occurred when Higgins allegedly sold him drugs."[5] *Id.*

Adams argues that the affidavit in her case is a "carbon copy" of the affidavit in *Higgins* and therefore is "woefully insufficient" to support the issuance of a search warrant. DE #49-1 at 6. In particular, Adams argues that, as in *Higgins*, the affidavit in her case does not attest to the informant's reliability, contains insufficient information to corroborate the informant's statements, and fails to establish a nexus between the evidence sought and the place to be searched. *Id.* at 5-6. Adams notes only "two main differences" between her case and the *Higgins* case—her lack of a prior felony record and the fact that the affiant observed Jones, the informant, at her apartment complex. *Id.* at 6. Adams contends, however, that these differences are "largely irrelevant." *Id.*

Though *Higgins* has some creditable parallels, the Court must disagree. The instant affidavit clearly is distinguishable from the affidavit in *Higgins*. The relevant distinguishing facts, set forth in the affidavit, are as follows: (1) Detective Curtsinger, the affiant, actually observed Jones at the apartment complex where Defendant lives or lived, and Jones remained at the complex for only approximately five minutes; (2) Detective Curtsinger observed Jones leave the apartment complex and travel **directly** to his residence, where waiting law enforcement searched him and recovered an ounce of heroin from his jacket pocket; (3) Jones informed police that the drug transaction

---

[5] In some ways, this seems the very type of hypertechnical review *Gates* blocked. The *Higgins* Court, *e.g.,* parses the corroboration from the passengers with cross-examination type scrutiny. The issuing judge knew, per the affidavit, that the passengers had separately and independently corroborated the source's information. Further, the affidavit easily would have supported an inference that the informant got drugs from within the described site—he designated a specific apartment as the "pick up location." *See also Higgins*, 557 F.3d at 401 (Kethledge, J., concurring) (enumerating five pieces of evidence that support a probable cause finding in the case).

occurred just prior to his arrest *inside* Defendant's apartment; and (4) Jones provided law enforcement with a physical description of Defendant, and Jones then identified Adams in a photo. These statements in the affidavit provided corroboration for Jones's story that simply was not present in *Higgins*.[6] Curtsinger's observation of Jones at Defendant's apartment complex, and the temporal proximity between that observation and the recovery of heroin from Jones's person, supported Jones's assertion that he had just purchased drugs from Adams on the day in question. *See Higgins*, 557 F.3d at 390. The same observations, and, more significantly, Jones's statement that the drug transaction took place inside Defendant's residence, established a nexus between the evidence sought and the place to be searched. *See id.*

The issuing state judge undoubtedly had a substantial basis for finding probable cause and did not act arbitrarily. A police veteran (of 11 years) made the application. Curtsinger monitored Jones's movement, placing him at the target complex for but five minutes (inferentially, enough time for a quick drug buy). Curtsinger then located heroin on Jones, at his home, after Jones travelled directly from Adams's apartment complex to the site of contact. Jones immediately cooperated and implicated himself (enhancing his own credibility) beyond the single ounce found—Jones confirmed long-term heroin dealing. Jones credibly described both the source and the source location, as corroborated through objective means. Jones had been inside the Adams apartment, and

---

[6] As in *Higgins*, law enforcement drove the informant to the apartment complex, where he pointed out Defendant's apartment and vehicle. Law enforcement confirmed that Defendant claimed the apartment identified by Jones as her address. Law enforcement further confirmed that the vehicle identified by Jones was registered to Adams. These facts clearly provide support for the state judge's probable cause finding. Because they are similar to the facts in *Higgins*, however, the Court does not discuss them in the body of the recommendation, instead focusing on the facts that distinguish Adams's case from *Higgins*.

10

he provided details (including, *e.g.*, that kids were around during the deal). He had been to "Aliya's" before, for arguably the same purpose, and he immediately, without prompting, led police back to the place and person from which he had just acquired the contraband on the day in question. If *Higgins* properly sets the probable cause bar in a case of this nature, the affidavit here is well above that bar. The constellation of circumstances surely combines to yield a fair probability that Adams's apartment would contain contraband. *See, e.g.*, United States v. Dyer, 580 F.3d 386, 392 (6th Cir. 2009) ("Because the informant witnessed the illegal activity on the premises searched and was known to the officer writing the affidavit, there were sufficient indicia of reliability without substantial independent police corroboration.").

In short, under the totality of the circumstances, and reviewing only the four corners of the subject affidavit, the Court finds that probable cause supported the warrant to search Defendant and her property. The information in the affidavit gave the issuing judge a substantial basis for concluding that evidence of illegal drug activity would be located in Defendant's residence and/or on her person.

    **B.**    **Defendant's Statements**

Adams asks the Court to suppress incriminating statements she made to law enforcement solely on the ground that the statements resulted directly from the allegedly unconstitutional search discussed above. Because the Court finds that probable cause supported the search warrant, there correspondingly is no basis to suppress Defendant's incriminating statements as fruit of the poisonous tree. *See United States v. Smith*, 386 F.3d 753, 763 (6th Cir. 2004) ("Under the fruit of the poisonous tree doctrine, all evidence derived from the exploitation of an illegal search or seizure must be suppressed,

11

unless the government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the constitutional violation.") (citation omitted).

### C. Exclusionary Rule and Good Faith

Even if probable cause did not support the warrant to search Defendant's person and home, the exclusionary rule here would not apply to bar admission of the evidence at trial. The Supreme Court has repeatedly stated that suppression is not an automatic result of a Fourth Amendment violation. *See Herring v. United States*, 129 S. Ct. 695, 700 (2009) ("The fact that a Fourth Amendment violation occurred—*i.e.*, that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies.") (citing *Gates*, 103 S. Ct. at 2324); *see also United States v. Master*, 614 F.3d 236, 242 (6th Cir. 2010). Here, the parties discuss application of the exclusionary rule in terms of *Leon*, the decision in which the Supreme Court articulated a good faith exception to the exclusionary rule. *See Leon*, 104 S. Ct. at 3420-21. Specifically, the Court held that suppression is not an appropriate remedy where police conduct a search in good faith pursuant to a warrant later declared invalid, except in the following circumstances: (1) where the issuing judge was "misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) where the issuing judge wholly abandoned his judicial role and acted merely as a rubber stamp for the police; (3) where the affidavit is so lacking in indicia of probable cause that official belief in its existence is entirely unreasonable; or (4) where the warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid."

*Id.* at 3421. Adams calls the application "bare bones" and seeks to avoid *Leon* warrant validation.

Although the parties reference *Leon*'s standards, in recent decisions the Supreme Court has refined its analysis to broaden *Leon*'s application. *See United States v. Davis*, 690 F.3d 226, 251-53 (4th Cir. 2012); *Master*, 614 F.3d at 241-42. In *Davis v. United States*, 131 S. Ct. 2419, 2426 (2011), for example, the Supreme Court explained that "[t]he [exclusionary] rule's sole purpose . . . is to deter future Fourth Amendment violations." Thus, according to the Court, "[w]here suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly . . . unwarranted.'" *Id.* at 2426-27 (citing *United States v. Janis*, 96 S. Ct. 3021, 3032 (1976)). The Court further explained that while "[r]eal deterrent value is a 'necessary condition for exclusion,' . . . it is not 'a sufficient' one." *Id.* at 2427 (citing *Hudson v. Michigan*, 126 S. Ct. 2159, 2166 (2006)). The Court noted that exclusion exacts substantial social costs, as it "almost always requires courts to ignore reliable, trustworthy evidence . . . . And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment." *Id.* (internal citation omitted). Accordingly, the Court held that "[f]or exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." *Id.* In doing so, as recognized by the Sixth Circuit, the Supreme Court has "effectively created a balancing test" for determining whether evidence must be suppressed as a result of a Fourth Amendment violation. *Master*, 614 F.3d at 243; *United States v. Fugate*, 499 F. App'x 514, 519 (6th Cir. 2012).

In considering the deterrent benefits of exclusion, the Supreme Court has directed lower courts to focus on the culpability of the law enforcement conduct at issue. *Davis*,

13

131 S. Ct. at 2427 (citing *Herring*, 129 S. Ct. at 701). Where the police have acted with "'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Id.* (citing *Herring*, 129 S. Ct. at 702); *see also Herring*, 129 S. Ct. at 702 ("[T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence."). Where police "conduct involves only simple, 'isolated' negligence," *Davis*, 131 S. Ct. at 2427-28 (citing *Herring*, 129 S. Ct. at 698), however, or where police have acted "with an objectively 'reasonable good-faith belief' that their conduct is lawful," *id.* at 2427 (citing *Leon*, 104 S. Ct. at 3413), the remedy of exclusion is not warranted. *Id.* at 2427-28. As succinctly summarized by the Supreme Court in *Herring*, "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." 129 S. Ct. at 702.

With respect to the search of Adams's person and property, there is nothing in the record to suggest that law enforcement acted with deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights.[7] Although Detective Curtsinger's affidavit may have been similar to the affidavit rejected by the Sixth Circuit in *Higgins*, there were critical additional and distinguishing facts such that an objective officer could

---

[7] The "four corners" issue is a closer one in the *Leon* context. The Sixth Circuit allows a reviewing court to consider more than the four corners ambit. Per *Frazier*, "a court reviewing an officer's good faith under *Leon* may look beyond the four corners of the warrant affidavits to information that was known to the officer and revealed to the issuing magistrate." *Frazier*, 423 F.3d at 535-36. Here, the Jones warrant group, issued the day before, involved the same applicant and the same issuing judicial officer. The Adams warrant application further mentioned (without explicitly incorporating) the Jones search warrant, and did name Jones. The Court does not rely on consideration of the Jones materials but does believe this is a scenario where *Frazier* likely would allow consideration. Because the Jones materials are not integral to a good faith finding, however, the Court takes the issue no further.

believe, reasonably, that the Adams affidavit supported a probable cause finding (and, indeed, this Court finds that the affidavit supported a determination of probable cause). Thus, suppressing the evidence obtained as a result of the search would have little to no deterrent value, and any deterrent value does not here outweigh the substantial costs of exclusion. Under the circumstances, the police conduct at issue was neither sufficiently deliberate nor sufficiently culpable to render the remedy of suppression worth its costs to the criminal justice system and society at large. The *Leon* threshold is, as *Higgins* noted, "a less demanding showing than the 'substantial basis' . . . required to prove the existence of probable cause." *Higgins*, 557 F.3d at 391 (quoting *Carpenter*, 360 F.3d at 595). On a weaker application, *Higgins* validated the subject search per *Leon*; here, a much stronger affidavit—one including intra-apartment observations, immediacy between purchase and police contact, and police confirmation that Jones was at Adams's complex minutes before discovery of the heroin—most certainly meets the objective reasonableness requirements of *Leon* and avoids suppression.

### III.     Recommendation

For the reasons stated, the Court **RECOMMENDS** that the District Judge **DENY** Adams's pending motion to suppress (DE #49).

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of that statute. In accordance with the District Judge's Order, any objections must be filed in advance of July 8, 2013, the pretrial conference date. *See* DE #66. The parties should consult the aforementioned statute and Federal Rule of Criminal Procedure 59(b) for specific appeal rights and mechanics. Failure to object in accordance with the rule waives a party's right to review.

This the 3rd day of July, 2013.

Signed By:
*Robert E. Wier* REW
United States Magistrate Judge